ACCEPTED
01-14-00389-CR
FIRST COURT OF APPEALS
HOUSTON, TEXAS
1/28/2015 1:22:41 PM
CHRISTOPHER PRINI
CLERK

## Nos. 01-14-00389-CR & 01-14-00390-CR

### In the Court of Appeals
### For the First District of Texas

FILED IN
1st COURT OF APPEALS
HOUSTON, TEXAS
1/28/2015 1:22:41 PM
CHRISTOPHER A. PRINE
Clerk

### Johnathan Renard Castaneda
*Appellant*

v.

### The State of Texas
*Appellee*

On Appeal from Cause Numbers 1350501 & 1350815
From the 263rd District Court of Harris County, Texas

### Brief for Appellant

**Oral Argument Not Requested**

**Alexander Bunin**
Chief Public Defender
Harris County, Texas

**Jani Maselli Wood**
Assistant Public Defender
Harris County, Texas
TBN. 00791195
1201 Franklin Street, 13th Floor
Houston, Texas 77002
Phone: (713) 368-0016
Fax: (713) 368-9278

Counsel for Appellant

## IDENTITY OF PARTIES AND COUNSEL

APPELLANT:                          Johnathan Renard Castaneda
TDCJ# 01927329
Clements Unit
9601 Spur 591
Amarillo, TX 79107-9606

TRIAL PROSECUTOR:         Matthew Roy Peneguy
Assistant District Attorney
Harris County, Texas
1201 Franklin, 6th Floor
Houston, Texas 77002

DEFENSE COUNSEL AT TRIAL:    Robert Scott
Attorney at Law
5803 2nd St., Suite 101
Katy, TX 77493

PRESIDING JUDGE:           Hon. Jim Wallace, Presiding Judge
263rd District Court
Harris County, Texas
1201 Franklin, 17th floor
Houston, Texas 77002

DEFENSE COUNSEL ON APPEAL:   Jani Maselli Wood[1]
Assistant Public Defender
Harris County, Texas
1201 Franklin, 15th Floor
Houston, Texas 77002

---

[1]
      University of Houston Advanced Legal Writing Class, Fall 2014, assisted with the research and drafting of this brief.

# TABLE OF CONTENTS

Identity of Parties and Counsel. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

Table of Contents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

Index of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

Statement of the Case. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Issues Presented. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Statement of Facts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Mr. Castaneda's Version of the Facts* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
*The State's Version of the Facts.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
*Conflicting testimony - the sexual assault.* . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
*Other State's Witnesses.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
*Mitigation Witnesses Who Provided Affidavits with Motion for New Trial* . . . . . . . . . 12

Summary of the Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Issue One:   A defendant is entitled to a lesser included offense instruction in the jury charge when requested. Mr. Castaneda's defense counsel properly requested an instruction on the lesser included offense of aggravated assault because Mr. Castaneda testified he did not intend to kill Mr. Armstrong. The judge refused the request. Did the judge improperly refuse the requested instruction?. . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Aggravated assault is a lesser included offense of murder.* . . . . . . . . . . . . . . . . . . 15
*The evidence presented at trial supports the lesser included offense of aggravated assault.* . . . 16
*The error in the charge resulted in sufficient harm to warrant reversal.* . . . . . . . . . . . . 18

Issue Two:  A jury may find a defendant not guilty of a greater offense, but guilty of a lesser-included offense. The trial court denied Mr. Castaneda's request for a jury instruction of the lesser-included offense of manslaughter. Did the trial court commit reversible error by denying this request?. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*The requested jury charge of manslaughter is, as a matter of law,*
*a lesser-included offense of murder..* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
*The record supports a conviction of only manslaughter..* . . . . . . . . . . . . . . . . . . . . . . . . 22
*The error was harmful and requires reversal..* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Issue Three: The jury charge must distinctly set forth the law applicable to the case. The trial court submitted a jury charge that was confusing and did not clearly instruct the jury that the state carried the burden of disproving self-defense. Was Mr. Castaneda egregiously harmed by the trial court's failure to properly instruct the jury on the law of self-defense?. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Relevant Facts.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
*Standard of Review.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
*The Trial Court Committed Error by Submitting a Faulty Jury Instruction.* . . . . . . . . . 27
*Burden of Proof.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
*Harm Analysis: The Errors in the Jury Charge Amounted to Egregious Harm..* . . . . . . . 31
     *A. The Jury Charge Itself.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
     *B. Arguments of Counsel..* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
     *C. The Entirety of the Evidence.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

Issue Four: Every defendant has a right to trial on legally sufficient evidence, which supports a conviction beyond a reasonable doubt for each element of the charged offense. Mr. Castaneda was convicted of aggravated sexual assault absent evidence that a deadly weapon was used and exhibited during the assault, an essential element to the charged offense. Did the jury convict Mr. Castaneda on the basis of insufficient evidence?. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*The hypothetically correct charge required the State to prove Mr. Castaneda*
*used and exhibited a deadly weapon during the assault.* . . . . . . . . . . . . . . . . . . . . . . . . . 36
*There was no proof Mr. Castaneda used and exhibited a deadly weapon*
*during the assault.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

iii

Issue Five:  The trial court must hold an evidentiary hearing on a motion for new trial if the motion and affidavits raise matters not determinable from the record, and the accused could be entitled to relief. The trial court failed to hold a hearing on the motion, which included affidavits from available mitigation witnesses who defense counsel did not call to testify. Did the court improperly deny Mr. Castaneda a hearing on his motion for new trial?. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

Issue Six: The DNA court cost assessed against appellant is an unconstitutional tax on Mr. Castaneda.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

Prayer.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

Certificate of Service.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

Certificate of Compliance.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

# INDEX OF AUTHORITIES

**Cases**:

*Almanza v. State*,
686 S.W.2d 157 (1984)............................................. 18, 31

*Barrera v. State*,
982 S.W.2d 415 (Tex. Crim. App. 1998)........................... 27

*Barrios v. State*,
283 S.W.3d 348 (Tex. Crim. App. 2009)........................... 27

*Barrios v. State*,
389 S.W.3d 382 (Tex. App.—Texarkana 2012, pet. ref'd)........... 16

*Barron v. State*,
353 S.W.3d 879 (Tex. Crim. App. 2011)........................ 24, 25

*Brooks v. State*,
323 S.W.3d 893 (Tex. Crim. App. 2010)........................... 36

*Burns v. State*,
923 S.W.2d 233 (Tex. App.-[14th Dist.] 1996).................... 23

*Cardenas v. State*,
423 S.W.3d 396 (Tex. Crim. App. 2014).......................... 46

*Cavazos v. State*,
382 S.W.3d 377 (Tex. Crim. App. 2012)................... 16, 20, 21, 22

*Crumpton v. State*,
301 S.W.3d 663 (Tex. Crim. App. 2009) ......................... 38

*Curry v. State*,
30 S.W.3d 394 (Tex. Crim. App. 2000)...................... 36, 37, 38

*Dowden v. State*,
> 758 S.W.2d 264 (Tex. Crim. App.1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Drichas v. State*,
> 175 S.W.3d 795 (Tex. Crim. App. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Ex parte Lemke*,
> 13 S.W.3d 791 (Tex. Crim. App. 2000).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*Ex parte Watson*,
> 306 S.W.3d 259 (Tex. Crim. App. 2009).. . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Forest v. State*,
> 989 S.W.2d 365 (Tex. Crim. App. 1999).. . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Gilder v. State*,
> 14-13-01088-CR, 2014 WL 7204962
> (Tex. App.—Houston [14th Dist.] Dec. 18, 2014, no. pet. h.). . . . . . . . . . . . . . 31

*Gollihar v. State*,
> 46 S.W.3d 243 (Tex. Crim. App. 2001).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Gonzales v. State*,
> 717 S.W.2d 355 (Tex. Crim. App. 1986).. . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Hayward v. State*,
> 158 S.W.3d 476 (Tex. Crim. App.2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Hollander v. State*,
> 414 S.W.3d 746 (Tex. Crim. App. 2013).. . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Jackson v. Virginia*,
> 443 U.S. 307 (1979). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Johnson v. State*,
> 423 S.W.3d 385 (Tex. Crim. App. 2014).. . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

*Johnson v. State,*
915 S.W.2d 653 (Tex. App.-Houston [14th Dist.) 1996, pet. ref'd). . . . . . . 17, 18

*LaFleur v. State,*
106 S.W.3d 91 (Tex. Crim. App. 2003).. . . . . . . . . . . . . . . . . . . . . . . . . . . . 37, 38

*Lawson v. State,*
775 S.W.2d 495 (Tex. App.-Austin 1989, pet. refd).. . . . . . . . . . . . . . . . . 17, 18

*Lee v. State,*
29 S.W.3d 570 (Tex. App. – Dallas 2000, no pet.).. . . . . . . . . . . . . . . . . . . . 31

*Lucero v. State,*
246 S.W.3d 86 (Tex. Crim. App. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41, 42

*Malik v. State,*
953 S.W.2d 234 (Tex. Crim. App. 1997).. . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Martinez v. State,*
74 S.W.3d 19 (Tex. Crim. App. 2002).. . . . . . . . . . . . . . . . . . . . . . . . 41, 42, 43

*Matthews v. State,*
999 S.W.2d 563 (Tex. App. – Houston, [14th Dist.] 1999, pet. ref'd). . . . . . . . . 31

*McCain v. State,* 22 S.W.3d 497, 503 (Tex. Crim. App. 2000).. . . . . . . . . . . . . . . . 38, 39

*McKithan v. State,*
324 S.W.3d 582 (Tex. Crim. App. 2010).. . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Merchant v. State,*
810 S.W.2d 305 (Tex. App.-Dallas 1991, pet ref'd).. . . . . . . . . . . . . . . . . . . . 23

*Milburn v. State,*
15 S.W.3d 267 (Tex. App.-Houston [14th Dist.] 2000, pet. ref'd). . . . . . . . . . . 44

*Miles v. State,*
204 S.W.3d 822 (Tex. Crim. App. 2006).. . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Moore v. State*,
    983 S.W.2d 15 (Tex. App.-Houston [14th Dist.] 1998, no pet.). . . . . . . . . . . . . 44

*Moore v. State*,
    969 S.W.2d 4 (Tex. Crim. App.1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Ngo v. State,*
    175 S.W.3d 738 (Tex. Crim. App. 2005).. . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Patterson v. State*,
    769 S.W.2d 938 (Tex. Crim. App. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Peraza v. State*,
    No. 01-12-00690-CR, 2014 WL 7476214
    (Tex. App. - Houston [1st Dist.] Dec. 30, 2014, pet. filed). . . . . . . . . . . 46, 47, 48

*Plummer v. State*,
    410 S.W.3d 855 (Tex. Crim. App. 2013).. . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Reeves v. State,*
    420 S.W.3d 812 (Tex. Crim. App. 2013) . . . . . . . . . . . . . . . . . . . . . . . . 27, 28, 29

*Salazar v. State*,
    87 S.W.3d 680 (Tex. Crim. App. 2002).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Smith v. State*,
    286 S.W.3d 333 (Tex. Crim. App. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . 41, 42

*Sweed v. State*,
    351 S.W.3d 63 (Tex. Crim. App. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Tidmore v. State*,
    976 S.W.2d 724 (Tex. App.—Tyler 1998, pet. ref'd). . . . . . . . . . . . . . . . . . . . . 29

*Trevino v. State*,
    100 S.W.3d 232 (Tex. Crim. App. 2003).. . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Wallace v. State*,
106 S.W.3d 103 (Tex. Crim. App. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Westbrook v. State*,
846 S.W.2d 155 (Tex. App.-Fort Worth 1993, no pet.) . . . . . . . . . . . . . . . . . . 22

*Williams v. State*,
547 S.W.2d 18 (Tex. Crim. App. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Williams v. State*,
314 S.W.3d 45 (Tex. App.-Tyler 2010, pet. ref' d) . . . . . . . . . . . . . . . . . . . . . 19

*Willis v. State*,
936 S.W.2d 302 (Tex. App.-Tyler, 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Winfrey v. State*,
323 S.W.3d 875 (Tex. Crim. App. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Wortham v. State*,
412 S.W.3d 552 (Tex. Crim. App. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17

**Statutes and Miscellaneous:**

TEX. CODE CRIM. PROC. ART. 36.14 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 27

TEX. CODE CRIM. PROC. ART. 37.09 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 20, 21

TEX. CODE CRIM. PROC. ART. 102.020(A)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

TEX. CRIM. PROC. ART. 102.020(H) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

TEX. GOV'T CODE ART. 411.1471(a)(1)(D) . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

TEX. GOV'T CODE ANN. §772.006(A)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

TEX. PEN. CODE §9.32(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33, 34

TEX. PENAL CODE ANN. §12.33(A). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

TEX. PENAL CODE ANN. §19.02(A)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

TEX. PENAL CODE ANN. § 19.02(B). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

TEX. PENAL CODE ANN. § 19.04.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

TEX. PENAL CODE ANN. § 22.02(A)(L). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

TEX. PENAL CODE ANN. §§ 22.02(B).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

TEX. PENAL CODE ANN. § 22.021(A). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Texas Criminal Patter Jury Charges—Defenses* (2013), §B14.4 . . . . . . . . . . . . . . . . . . . . 29, 31

## STATEMENT OF THE CASE

Johnathan Renard Castaneda was indicted for aggravated sexual assault of an adult (1 C.R. at 12) and murder. (2 C.R. at 13).[2] He was tried by a jury and was convicted of both offenses on April 24, 2014. (1 C.R. at 69; 2 C.R. at 77). Mr. Castaneda elected to have the court assess punishment. (7 R.R. at 5-8). At sentencing, he admitted to a 2008 conviction for felony sexual assault as part of the aggravated sexual assault conviction (7 R.R. at 5), cited in the first enhancement paragraph. (1 C.R. at 12, 73). He also admitted to a 2008 conviction of felony sexual assault of a child as part of the murder conviction (7 R.R. at 5), cited in the first enhancement paragraph. (2 C.R. at 13, 81). The court sentenced him to an automatic life sentence for the enhanced aggravated sexual assault conviction (7 R.R. at 7-8; 1 C.R. at 73), and 45 years in prison for the murder. (7 R.R. at 8; 2 C.R. at 81).

Mr. Castaneda filed a timely Notice of Appeal on April 24, 2014. (1 C.R. 77; 2 C.R. at 85). Appellate counsel was appointed on April 25, 2014. (1 C.R. at 80; 2 C.R. at 88). She filed a timely Motion for New Trial on May 22, 2014. (1 C.R. at 82; 2 C.R. at 90), which was presented to the judge on May 23, 2014. (1 C.R. at 174; 2 C.R. at 182). The court did not rule on the request for a hearing on the Motion for New Trial. (1 C.R. at 158; 2 C.R. at 174). No order granting or denying the motion was issued by the court. (1 C.R. at 159; 2 C.R. at 174).

---

[2] This appeal involves the consolidation of two charges, resulting in two clerk's records. The clerk's record for the aggravated sexual assault charge (Cause No. 1350501) will be referred to as "1 C.R." The clerk's record for the murder charge (Cause No. 1350815) will be referred to as "2 C.R."

1

## ISSUES PRESENTED

Issue One: A defendant is entitled to a lesser included offense instruction in the jury charge when requested. Mr. Castaneda's defense counsel properly requested an instruction on the lesser included offense of aggravated assault because Mr. Castaneda testified he did not intend to kill Mr. Armstrong. The judge refused the request. Did the judge improperly refuse the requested instruction?

Issue Two: A jury may find a defendant not guilty of a greater offense, but guilty of a lesser-included offense. The trial court denied Mr. Castaneda's request for a jury instruction of the lesser-included offense of manslaughter. Did the trial court commit reversible error by denying this request?

Issue Three: The jury charge must distinctly set forth the law applicable to the case. The trial court submitted a jury charge that was confusing and did not clearly instruct the jury that the state carried the burden of disproving self-defense. Was Mr. Castaneda egregiously harmed by the trial court's failure to properly instruct the jury on the law of self-defense?

Issue Four: Every defendant has a right to trial on legally sufficient evidence, which supports a conviction beyond a reasonable doubt for each element of the charged offense. Mr. Castaneda was convicted of aggravated sexual assault absent evidence that a deadly weapon was used and exhibited during the assault, an essential element to the charged offense. Did the jury convict Mr. Castaneda on the basis of insufficient evidence?

Issue Five: The trial court must hold an evidentiary hearing on a motion for new trial if the motion and affidavits raise matters not determinable from the record, and the accused could be entitled to relief. The trial court failed to hold a hearing on the motion, which included affidavits from available mitigation witnesses who defense counsel did not call to testify. Did the court improperly deny Mr. Castaneda a hearing on his motion for new trial?

Issue Six: The DNA court cost assessed against appellant is an unconstitutional tax on Mr. Castaneda.

2

Mr. Castaneda and the State's star witness agree on two important facts: (1) the deceased complainant was threatening people with a firearm in an attempt to find his missing truck keys; and (2) Mr. Castaneda killed the deceased in response to these threats. Their stories diverge in regard to the circumstances surrounding the death and what happened in the aftermath.

*Mr. Castaneda's Version of the Facts*

Mr. Castaneda and the deceased complainant, Keith Armstrong, were acquaintances. (6 R.R. at 13-14). In the late morning of June 8, 2012, Mr. Castaneda was walking from the bus stop when Armstrong invited him over to his house. (6 R.R. at 15-16). Mr. Castaneda went to Armstrong's house and had consensual sex with a prostitute, Patricia Asberry. (6 R.R. at 19). He was supposed to pay $60 to Keith for the sex but he failed to do so. (6 R.R. at 19). Mr. Castaneda then left alone to go to his grandfather's house down the street. (6 R.R. at 20).

Later that afternoon around 2 or 3 p.m., Mr. Castaneda went back to Armstrong's house. (6 R.R. at 22). Armstrong was upset about Mr. Castaneda not paying him for the sex with Patricia. (6 R.R. at 22). Mr. Castaneda told Armstrong that he could pay him after he purchased and sold some crack. (6 R.R. at 22).

Armstrong drove Mr. Castaneda around town searching for crack, but they did not find any that met Mr. Castaneda's standards. (6 R.R. at 22-23). They then went back to Armstrong's house, where another individual later arrived with crack cocaine

that Mr. Castaneda purchased. (6 R.R. at 25). Mr. Castaneda then left to make some sales .(6 R.R. at 26).

Mr. Castaneda then headed back to his grandfather's house. (6 R.R. at 27). He received a phone call from a woman that he was supposed to meet that night, so he went to the bus stop near Armstrong's house. (6 R.R. at 27-28). As Mr. Castaneda was passing by Armstrong's house, Armstrong was outside waiving a gun and told Mr. Castaneda to come over to him. (6 R.R. at 28-30). Mr. Castaneda complied. Armstrong told Mr. Castaneda that he wanted his truck keys; Mr. Castaneda said he did not have them, and Armstrong ordered him into the house. (6 R.R. at 30-31). Other residents of the house - Patricia Asbury, Margaret Stewart, and Charles Howard - were also ordered to go inside. (6 R.R. at 28-31).

Armstrong locked the burglar bars of the front door and began looking for his keys while everyone nervously waited. (6 R.R. at 32). He was angry, drunk, and carrying a pistol. (6 R.R. at 35). Patricia and Margaret told Mr. Castaneda "to be still because Keith might start tripping out about his keys." (6 R.R. at 43).

After Armstrong could not find his keys, he began threatening individuals. First, he put a gun to Patricia's head and she began to cry in fear. (6 R.R. at 37). Then he approached Mr. Castaneda and told him, "I'm not saying that you have my keys, but you're the only one who left." (6 R.R. at 39). Mr. Castaneda emptied out his pockets with the exception of his dope. (6 R.R. at 39-40). Armstrong told him to give him the drugs but Mr. Castaneda refused. (6 R.R. at 41).

4

The altercation then escalated. Armstrong pointed the gun in Mr. Castaneda's face and repeated his demand to give him the drugs. (6 R.R. at 41). Mr. Castaneda, who was scared at this point, tells Armstrong, "get that goddamn gun out of my face" and he smacked it. (6 R.R. at 42-43). Armstrong got angry and pushed Mr. Castaneda on the table. (6 R.R. at 43). As Mr. Castaneda stood up, Armstrong pointed the gun about an inch from his chest. (6 R.R. at 43-44). Mr. Castaneda, thinking Armstrong was going to kill him, grabbed the gun by the barrel with his left hand and hit Armstrong a couple of times with his right. (6 R.R. at 45).

The two men then began to wrestle. Mr. Castaneda hit Armstrong with an uppercut, which dazed Armstrong. (6 R.R. at 45). Then all of the other people in the house - Charles Howard, Patricia Asbury, and Martha Stewart - jumped on Mr. Castaneda and began to punch and hit him with objects in the house. (6 R.R. at 45-47).

Mr. Castaneda and Armstrong continued fighting while Mr. Castaneda held on to the barrel of the gun. Mr. Castaneda kicked Armstrong in the testicles, which dazed Armstrong. (6 R.R. at 49). Mr. Castaneda let go of the gun, punched Armstrong multiple times, and then pushed him over. (6 R.R. at 49). Armstrong attempted to get up. He was on his hands and knees when Mr. Castaneda kicked him multiple times until Armstrong fell over. (6 R.R. at 61-62). Charles Howard, on his knees, was grabbing Mr. Castaneda and trying to bring him to the ground. (6 R.R. at 62). Mr. Castaneda heard someone say, "Grab the gun." (6 R.R. at 62). Armstrong, still on the

5

ground, shot "like three times." (6 R.R. at 62). In response, Mr. Castaneda grabbed a pipe and hits Armstrong approximately five times. (6 R.R. at 62-63).

Mr. Castaneda shook Mr. Howard off of him by hitting him with a chair. (6 R.R. at 57). He tried to open the burglar bars on the front door but they were locked. (6 R.R. at 57). Mr. Castaneda went to the side room where Margaret had gone (6 R.R. at 57-58, 63). Mr. Howard came up behind Mr. Castaneda and put him in a chokehold that nearly left Mr. Castaneda unconscious. (6 R.R. at 58, 63). Mr. Castaneda hit him with a chair, which forced Howard to let him go. (6 R.R. at 58, 63).

Mr. Castaneda began looking through the house for the keys to the burglar bars. (6 R.R. at 63). When he was back in Armstrong's room, Mr. Castaneda heard Margaret Stewart leave the house, so he followed after her. (6 R.R. at 63). Mr. Castaneda testified that he chased Margaret to the neighbor's house because he was "mad" and "pissed off" because he believed she had the keys the whole time. (6 R.R. at 68-69).

Mr. Castaneda's grandfather, Edward Mosely, confirmed that Mr. Castaneda came to his house shortly afterward. (5 R.R. at 199-200). He testified that his grandson was bleeding from his head and neck, his eye was swollen, he was "blistered up," and his "face was all scratched up." (5 R.R. at 203-205). He testified that Mr. Castaneda washed off the blood in his kitchen sink, asked for a clean shirt, and left after about 15 minutes. (5 R.R. at 220-223).

After Mr. Castaneda left his grandfather's house, he went to the corner of the driveway and observed the police and paramedics arrive. (6 R.R. at 71-72). He had

crack cocaine in his possession, so he did not want to talk to the police. (6 R.R. at 74). He also did not "think it was worth talking to the police" because he did not know the situation was as severe as it turned out to be and he "wasn't thinking." (6 R.R. at 74). Mr. Castaneda then went to an abandoned house to spend the night. (6 R.R. at 74-75).

The next day Mr. Castaneda went to his mother's house. (6 R.R. at 79). His family told him he should talk to the police to tell them his side of the story, but Mr. Castaneda was scared and thought he needed to hire a lawyer. (6 R.R. at 80). He was arrested three days later. (6 R.R. at 79-80).

Mr. Castaneda admitted to lying to the police during their questioning of him. He testified that he lied to the police when he told them: he kicked down the bathroom door where Patricia was hiding (6 R.R. at 89-90); he paid Armstrong for sex with Patricia (6 R.R. at 98); he had sex with Patricia on Wednesday and Thursday (6 R.R. at 102-103); and he hit Armstrong with the gun and chair. (6 R.R. at 115, 118-119). He admitted he did not tell the police about Armstrong firing the gun three times at him (6 R.R. at 109).

*The State's Version of the Facts*

Patricia Asberry was the only State's witness who could testify first-hand to the events that occurred in Armstrong's house that night. At the time of her testimony, she was housed in the Harris County jail for felony prostitution. (4 R.R. at 94-95). She had 15 prior prostitution convictions, two felony convictions for forged checks, and felony convictions for felony drug sales, namely cocaine. (4 R.R. at 95-98, 188-189). She was serving a 25-year parole term when she was arrested for the felony

7

prostitution offense she was charged with at the time of trial. (4 R.R. at 98, 201). She admitted to being a regular crack smoker while on parole and during the period when the incident occurred. (4 R.R. at 202).

Asberry said that she had consensual sex with Mr. Castaneda on Wednesday night, the day before the incident. (4 R.R. at 124-125). This occurred at Armstrong's house in the back bedroom, which she rented. (4 R.R. at 101, 125).

Asberry testified that Mr. Castaneda next came over to Armstrong's house on Thursday afternoon to charge his cell phone. (4 R.R. at 135-136). She said that Mr. Castaneda and Armstrong left two or three times afterward to buy liquor and beer and crack. (4 R.R. at 137).

When it was getting dark, Mr. Castaneda left the house for about 15 to 30 minutes according to Asberry. (4 R.R. at 139-140). About this time, Keith Armstrong began looking for his car keys and was getting upset. (4 R.R. at 141-142). After Mr. Castaneda came back, Armstrong told everyone to go in the house and he grabbed his gun from his room. (4 R.R. at 142-143). Armstrong came out into the living room, pointed the gun at Ms. Asberry's head, and told her he wanted the keys. (4 R.R. at 145). She began crying and insisted that she did not have them. (4 R.R. at 145).

Then Armstrong went over to Mr. Castaneda with the gun behind his back and told him he wanted his keys. (4 R.R. at 146). According to Ms. Asberry, Mr. Castaneda raised up from the chair he was sitting and hit Armstrong, knocking him across the room to the couch. (4 R.R. at 146). She said Armstrong never threatened Mr. Castaneda with the gun. (4 R.R. at 146-147). Mr. Castaneda was "steady whooping"

8

Armstrong and then slammed him on the floor. (4 R.R. at 150). According to Asberry, Keith Armstrong no longer had the gun at this point and was no longer moving after he hit the floor. (4 R.R. at 149, 152). She testified that Mr. Castaneda kicked his teeth out, began hitting him with the pipe, and then hit him in the head with a stove and music box. (4 R.R. at 152). Asberry tried to stop Mr. Castaneda by hitting him in the back of the head. (4 R.R. at 152). He responded by hitting her with the pipe and asking her, "you going to take up for him." (4 R.R. at 152, 158).

Asberry testified that she went back to her bathroom and locked it. (4 R.R. at 161-162). She heard Margaret hollering "I don't know where no gun is" and Mr. Castaneda asking where the gun was. (4 R.R. at 162). She testified that it was quiet for a few minutes and then Mr. Castaneda kicked in the bathroom door where she was hiding. (4 R.R. at 165-166). Mr. Castaneda had a pipe in his hand according to Asberry. (4 R.R. at 168). She testified that Mr. Castaneda then sexually assaulted her. (4 R.R. at 169-173). He stopped and left after hearing the burglar bar door slam. (4 R.R. at 175). Asberry then went outside to see the ambulance and tell the police what happened. (4 R.R. at 177-178).

*Conflicting testimony - the sexual assault*

Right after defending himself, Mr. Castaneda left the house on Van Fleet Street and went to his Grandfather's home. There was never a sexual encounter with Ms. Asberry later that day. However, during trial, Ms. Asberry testified that after Mr. Castaneda defended himself against Mr. Armstrong, he had sex with her without her consent. (4 R.R. at 172). Mr. Castaneda came to the bathroom where Ms. Asberry was

9

hiding. He opened the door and told her to come out of the bathroom; Ms. Asberry did so without objection. (4 R.R. at 169). Mr. Castaneda had a metal bar in his hand when he first saw Ms. Asberry. However, he put the metal bar down on the table next to him during the alleged encounter. (4 R.R. at 176). Mr. Castaneda was acting different than the first time Ms. Asberry met him. (4 R.R. at 140). His whole attitude had changed. His voice was different. He was not the same person. (4 R.R. at 167). The jury found Mr. Castaneda guilty of sexually assaulting Ms. Asberry and the murder of Mr. Armstrong. (6 R.R. at 187-88).

<div align="center">*Other State's Witnesses*</div>

Officer G. Salcido was the first police officer who arrived at the crime scene. (3 R.R. at 47). He was trying to get information from Margaret, who was sitting on the side of the street, when Asberry walked by the scene (3 R.R. at 48). Asberry said she had been raped. (3 R.R. at 49-50). Salcido and another officer searched the house, and found a person lying on the floor in a pool of blood, and an older gentleman in the house. (3 R.R. at 52-53). Salcido testified that the house was "all torn up," and "it was all chaos in there." Salcido later transported Asberry to the hospital. (3 R.R. at 56).

Owen Tompkins was the crime scene officer who documented the crime scene. (3 R.R. at 77). He described the house as "extremely bloody … fairly unkempt itself, not very clean." (3 R.R. at 82). He testified that Armstrong, the decedent, did not appear to have been disturbed from where he initially fell. (4 R.R. at 18). He did not find a gun or any bullets or shell casings. (4 R.R. at 63). He found broken table legs

<div align="center">10</div>

covered in blood (4 R.R. at 29), broken chair legs covered in blood (4 R.R. at 33-34), and a metal table leg covered in blood. (4 R.R. at 47-48).

Mark Stahlin was the homicide officer on the case. (4 R.R. at 268). He said that the house where the homicide occurred "looked like a tornado had gone through. Nothing really was in its place. … There was blood on the walls, blood on the carpet. The complainant, Baron Armstrong, was laying on the floor." (4 R.R. at 273). There were broken off items from a wooden chair near the decedent. (4 R.R. at 283-284). There was a wooden table lying on its side. (4 R.R. at 285). There were metal table legs close to the body and further away. (4 R.R. at 286). He did not locate any semen in the back bedroom, nor did he find any evidence of sexual assault. (4 R.R. at 302, 305). He did find a car key and house keys in Armstrong's bedroom. (4 R.R. at 308).

Sergeant C.E. Elliott was another homicide officer who worked the case. (5 R.R. at 84). He took photos of Mr. Castaneda when he was arrested three days after the incident. (5 R.R. at 110). There were no injuries to Mr. Castaneda's back according to Elliott. (5 R.R. at 112). There was a scratch across his right forearm with dried blood. (5 R.R. at 113). He also had an abrasion on his right hand knuckle. (5 R.R. at 114).

Dr. Albert Chu was the assistant medical examiner for the Harris County Institute of Forensic Sciences who examined Armstrong. (5 R.R. at 118, 122). He testified that Armstrong's cause of death was blunt trauma of the head and neck. (5 R.R. at 153). There was bleeding of different layers of the brain, which can cause death. (5 R.R. at 153). He testified that there was "quite a bit of facial trauma" and a

11

deformed shape of the head due to fractures of the facial bones. (5 R.R. at 134). He also had multiple abrasions across the back of the head. (5 R.R. at 139). In Chu's opinion, Armstrong had been struck multiple times. (5 R.R. at 141-142).

Dr. Jennifer Love is a forensic anthropologist at the Harris County Institute of Forensic Sciences who examined Armstrong. (5 R.R. at 164). She testified that Armstrong's fractures were "consistent with a minimum of five impacts to the face." (5 R.R. at 174). There were a few fractures to the skull that were likely a result of the impact to the face. (5 R.R. at 175). Three ribs were fractured. (5 R.R. at 177). There were several fractures in his neck. (5 R.R. at 181).

*Mitigation Witnesses Who Provided Affidavits with Motion for New Trial*

Defense counsel called no mitigation witnesses at the punishment phase of the trial (7 R.R. at 7), but multiple witnesses were available to testify about mitigating circumstances regarding Mr. Castaneda. (2 C.R. at 91-92). Mr. Castaneda received an automatic life sentence for the enhanced aggravated sexual assault conviction (7 R.R. at 7-8; 1 C.R. at 73), and 45 years in prison for murder. (7 R.R. at 8; 2 C.R. at 81).

Linda Castaneda is Mr. Castaneda's mother. (2 C.R. at 120). Her affidavit attached to the Motion for New Trial said that she could testify about his history of bipolar and schizophrenia. (2 C.R. at 120).

Shandr'a Mosley Banks is a relative of Mr. Castaneda's. (2 C.R. at 123). She stated in her affidavit that Mr. Castaneda had been medicated for mental health issues since elementary school; he was struck by a car shortly after being diagnosed with bipolar and schizophrenia when he was a young man; he has been treated for those

12

mental illnesses for many years; and she saw him the afternoon after the incident and could testify about injuries he had suffered as a result. (2 C.R. at 123-124).

Ruthie Hudson is Mr. Castaneda's grandmother. (2 C.R. at 127). She stated in her affidavit that Mr. Castaneda was diagnosed with ADHD and bipolar, and received treatment at DePelchin Center. (2 C.R. at 127). She could also testify to the wounds she saw he received after the incident. (2 C.R. at 127).

Courtney Hutchinson and Shunta Richardson are Mr. Castaneda's cousins. (2 C.R. at 118, 131). They both could testify to his mental illness. (2 C.R. at 118, 131).

Mary Banks is Mr. Castaneda's aunt; her affidavit stated that Mr. Castaneda was hit by a car, which resulted in head injuries. (2 C.R. at 108).

J'onze Re'Banks has known Mr. Castaneda for 16 years. (2 C.R. at 134). He discussed Mr. Castaneda's struggles with mental illness and his various positive character traits in his affidavit (2 C.R. at 134).

## SUMMARY OF THE ARGUMENT

Two complicated serious felonies were tried together - aggravated sexual assault and murder. The jury charge had numerous errors. Two, the failure to include the lesser-included offenses of aggravated assault and manslaughter were objected to. The evidence was raised to support those instructions and the trial court erred by failing to include them. The requested self-defense instruction was so complicated that it failed to sufficiently apprise the jury of the proper standard and burden.

The evidence to support the aggravated portion of the sexual assault conviction was insufficient because there was no evidence to support the weapon was used or exhibited during the charged conduct. It was on a table - but its mere presence is insufficient to support that conviction.

During the punishment phase of the trial, no witnesses were offered in support of Mr. Castaneda. Post-trial, a motion for new trial was filed with numerous affidavits of witnesses who could have testified to Mr. Castaneda's personal struggles. The trial court refused to have a hearing despite new evidence bing proffered. Finally, the cost bill has a $25- DNA testing fee. Under law from this court, that cost should be stricken.

**Issue One: A defendant is entitled to a lesser-included offense instruction in the jury charge when requested. Mr. Castaneda's defense counsel properly requested an instruction on the lesser included offense of aggravated assault because Mr. Castaneda testified he did not intend to kill Mr. Armstrong. The judge refused the request. Did the judge improperly refuse the requested instruction?**

Mr. Castaneda's request for an instruction on aggravated assault was denied by the trial court. (6 R.R. at 144). A trial court may instruct the jury on a lesser included offense if (1) the offense in question is a lesser included offense under Article 37.09 of the Texas Code of Criminal Procedure and (2) there is some evidence that would permit a rational jury to find that the defendant is not guilty of the greater offense but is guilty of the lesser included offense. *Hayward v. State*, 158 S.W.3d 476, 478 (Tex. Crim. App.2005); *Moore v. State*, 969 S.W.2d 4, 8 (Tex. Crim. App.1998). If both prongs of the test are met, the error is reviewed for harm. *Trevino v. State*, 100 S.W.3d 232, 242 (Tex. Crim. App. 2003).

Because the lesser included offense of aggravated assault meets both prongs of the test and Mr. Castaneda was harmed by the error in not including the offense in the charge, the judgment and murder conviction must be reversed, and the case remanded for a new trial based on the proper charge.

*Aggravated assault is a lesser included offense of murder*

An instruction is required on a lesser included offense where the proof required for the greater offense includes the proof necessary to establish the lesser included offense. *Forest v. State*, 989 S.W.2d 365, 367 (Tex. Crim. App. 1999). A person

15

commits aggravated assault if he intentionally, knowingly, or recklessly causes serious bodily injury to another. TEX. PENAL CODE ANN. § 22.02(A)(L). A person commits murder if he intentionally or knowingly causes another's death or intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual. TEX. PENAL CODE ANN. § 19.02(B).

Comparing the statutory definitions, the elements required to prove aggravated assault are included in the elements necessary to establish murder. Therefore, aggravated assault is a lesser included offense of murder. *Salazar v. State*, 87 S.W.3d 680, 683 (Tex. Crim. App. 2002). *See Barrios v. State*, 389 S.W.3d 382, 399 (Tex. App.—Texarkana 2012, pet. ref'd)(explaining that "all of the elements of aggravated assault were required to prove murder in this case, aggravated assault is a lesser-included offense of murder...") *citing Dowden v. State*, 758 S.W.2d 264, 269 (Tex. Crim. App.1988) and *Forest v. State*, 989 S.W.2d 365, 367–68 (Tex. Crim. App.1999).

*The evidence presented at trial supports the lesser included offense of aggravated assault*

The second prong of the test is satisfied if there is some evidence that would allow a rational jury to find that the defendant is only guilty of aggravated assault. *Salazar*, 87 S.W.3d at 683. The court may not consider the credibility of the evidence. *Wortham v. State*, 412 S.W.3d 552, 558 (Tex. Crim. App. 2013). Anything more than a scintilla of evidence entitles Mr. Castaneda to the lesser charge, regardless of whether the evidence is weak, impeached, or contradicted. *Id.*; *Cavazos v. State*, 382 S.W.3d 377, 383 (Tex. Crim. App. 2012).

The requisite intent of the defendant is a predominant factor in determining whether an aggravated assault charge applies. Lesser included offenses have been

16

allowed where the defendant presented evidence that negated an element of intent in the charged offense. *Wortham*, 412 S.W.3d at 558. Often, the lack of intent is established through the defendant's testimony.

An aggravated assault instruction is proper even if the defendant killed the deceased. For example, the court in *Lawson v. State* allowed a lesser included offense of aggravated assault where Lawson testified that he did not intend to kill or shoot the deceased. *Lawson v. State*, 775 S.W.2d 495, 499 (Tex. App.-Austin 1989, pet. refd). This testimony negated the intent element of the charge. *Id.* At trial, Lawson confessed that he shot the deceased, but claimed the killing was an accident. *Id.* at 496. The deceased had threatened Lawson with a pistol, and Lawson fought back by jabbing and pounding the deceased. *Id.* During the fight, the pistol discharged, killing the deceased. *Id.* At trial, the court allowed charges on manslaughter and self-defense, but denied the requested aggravated assault charge. *Id.* The appellate court held that Lawson was entitled to the requested aggravated assault charge, and the jury was free to believe or reject Lawson's testimony. *Id.* at 500.

Emphasis on the defendant's testimony is also used to establish intent, rather than negate it. In *Johnson v. State*, the defendant testified that when the deceased slapped him, he loaded the gun and shot. *Johnson v. State*, 915 S.W.2d 653, 658 (Tex. App.-Houston [14th Dist.) 1996, pet. ref'd). The defendant testified that he did not intend to kill the deceased, but did intend to get the deceased off of him. *Id.* The court noted that an aggravated assault charge would be required if there was testimony indicating a lack of intent to kill the deceased. *Id.* at 660. However, the defendant's testimony showed a deliberate intent to kill the deceased. *Id.*. Because the defendant's

17

testimony established rather than negated intent, the court denied the requested aggravated assault instruction. *Id.*

Mr. Castaneda's testimony negates intent rather than establishes intent. Similar to the defendant in *Lawson v. State*, Mr. Castaneda specifically testified that he did not intend to kill Mr. Armstrong. Identical to Lawson, who fought back when the deceased threatened him with a pistol, Mr. Castaneda fought back when Mr. Armstrong threatened him with a pistol. Unlike the defendant in *Johnson*, who testified that he intended to shoot the deceased, Mr. Castaneda did not testify that he intended to hurt Mr. Armstrong.

Because a juror could rely on Mr. Castaneda's testimony to find that Mr. Castaneda did not intend to kill Mr. Armstrong, Mr. Castaneda was entitled to a charge on the lesser included offense of aggravated assault. The credibility of Mr. Castaneda's testimony negating intent rests in the hands of the jury; they alone decide whether Mr. Castaneda was guilty of murder or aggravated assault.

*The error in the charge resulted in sufficient harm to warrant reversal*

If error is found in the charge, the degree of harm necessary for reversal depends on whether the appellant objected to the charge during trial. *Almanza v. State*, 686 S.W.2d 157, 171 (1984). If the error in the charge was timely objected to, reversal is required so long as the error is not harmless. *Id.* The error is not harmless if it is "calculated to injure the rights of defendant." *Id.* The defendant's harm must be calculated in light of the entire jury charge, the state of the evidence, the argument of counsel, and any other relevant information revealed by the trial record. *Id.* Harm exists when the penalty imposed for the charged offense exceeds the potential penalty

18

for the lesser-included offense. *Williams v. State*, 314 S.W.3d 45, 53 (Tex. App.-Tyler 2010, pet. ref' d).

Mr. Castaneda's defense counsel properly objected to the error in the charge during trial.  (6 R.R. at 144).  Therefore, Mr. Castaneda is entitled to reversal so long as the error was not harmless.

The error here is apparent. The penalty imposed for murder far exceeds the penalty imposed for aggravated assault. Aggravated assault is a second degree felony punishable by imprisonment for any term of not more than 20 years or less than 2 years. TEX. PENAL CODE ANN. §§ 22.02(B), 12.33(A). Instead, Mr. Castaneda was sentenced to 45 years in prison for murder (7 R.R. at 8). Even if the jury rejected the self-defense charge, there was still evidence that Mr. Castaneda did not act with the intent to kill. If Mr. Castaneda's actions merely amounted to aggravated assault, his maximum sentence would be less than half of the sentence he received. Therefore, Mr. Castaneda was harmed when the lesser-included offense of aggravated assault was denied.

**Issue Two: A jury may find a defendant not guilty of a greater offense, but guilty of a lesser-included offense. The trial court denied Mr. Castaneda's request for a jury instruction of the lesser-included offense of manslaughter. Did the trial court commit reversible error by denying this request?**

Mr. Castaneda requested manslaughter be included in the charge and the court denied the request. (6 R.R. at 143-45). There is a two-pronged test to determine whether a defendant is entitled to a jury instruction on a lesser-included offense. *See* TEX. CODE CRIM. PROC. ANN. ART. 37.09, and discussion *supra;.* First, does the proof necessary to establish the charged offense also include the lesser offense? *Cavazos v. State*, 382 S.W.3d 377, 382 (Tex. Crim. App. 2012). The court answers this question by comparing the elements alleged in the indictment with the elements of the lesser offense. *Id.* Second, the court must determine if there is some evidence from which a rational jury could acquit the defendant of the greater offense, but find him guilty of the lesser-included offense. *Sweed v. State*, 351 S.W.3d 63, 67-68 (Tex. Crim. App. 2011). The first step is a question of law, and does not depend on evidence presented at trial. *Cavazos*, 382 S.W.3d at 382. The second step is a question of fact and is based on the evidence presented at trial. *Id.* at 383.

*The requested jury charge of manslaughter is, as a matter of law, a lesser-included offense of murder.*

An offense is lesser included if, in relevant part, it "is established by proof of the same or less than all the facts required to establish the commission of the offense charged" or "if it differs from the charged offense only in respect to a lesser culpable mental state." TEX. CODE CRIM. PROC. ANN. ART. 37.09(1),(3). An offense qualifies under Article 37.09(1) as lesser included if the indictment for the greater offense either alleges all of the elements of the lesser-included offense, or the court determines they

20

are nonetheless functionally the same or less than those required to prove the charged offense. *See Ex parte Watson*, 306 S.W.3d 259, 273 (Tex. Crim. App. 2009); *see also McKithan v. State*, 324 S.W.3d 582, 588 (Tex. Crim. App. 2010).

In *Cavazos v. State*, the Court of Criminal Appeals was faced with a similar question as the one here: is manslaughter a lesser-included offense of murder, thus rendering the jury charge of only murder reversible error? *Cavazos*, 382 S.W.3d at 384. The differences between manslaughter and the charged offense in *Cavazos* are that murder includes intent to cause serious bodily injury and the commission of an act clearly dangerous to human life, whereas manslaughter requires recklessness, which 1s a conscious disregard of a substantial and unjustifiable risk regarding circumstances or results surrounding the conduct. *Id.*

The Court determined that shooting the victim with a firearm, which was the commission of an act clearly dangerous to human life, is the circumstance surrounding the conduct, not the result itself, and would be the same under either murder or manslaughter. *Id.* The Court then determined the intent element of both crimes. *Id.* The defendant in that case shot the victim with a deadly weapon, implying that he had the intent to cause the victim's death. *Id.* In comparison, the definition of recklessness is disregarding a risk that circumstances exist or that a result will occur. *Id.*

The Court concluded that causing death while consciously disregarding a risk that death will occur differs from intending to cause serious bodily injury with death resulting only in the respect that a less culpable mental state establishes its commission. *Id.* (*citing* TEX. CODE CRIM. PROC. ANN. ART. 37.09(3)). The Court concluded that manslaughter is a lesser-included offense of murder. *Id.*

21

In the case *sub judice*, the base elements of murder, as alleged in the indictment, are: (1) Johnathan Renard Castaneda (2) did unlawfully intend to cause serious bodily injury to Baron Keith Armstrong and (3) did cause the death of Mr. Armstrong by (4) intentionally and knowingly committing an act clearly dangerous to human life, namely striking Mr. Armstrong with his hand and with an unknown object (2 C.R. at 13). In comparison, the base elements of manslaughter are (1) a person (2) recklessly (3) causing the death of an individual. TEX. PENAL CODE ANN. § 19.04.

Just as was the case in *Cavazos*, the only difference between the two offenses are the intent to cause serious bodily injury and the commission of an act clearly dangerous to human life, as compared to the recklessness element of manslaughter. This Court can use the same reasoning applied in *Cavazos* to determine that causing death while consciously disregarding a risk that death will occur differs from intending to cause serious bodily injury with death resulting only in the respect that a less culpable mental state establishes its commission. Manslaughter is a lesser-included offense of murder in this case.

*The record supports a conviction of only manslaughter.*

The second step in the "lesser-included offense" analysis is to determine if there is any evidence raised that the defendant was guilty of only the lesser offense. *Cavazos*, 382 S.W.3d at 385. More specifically, courts have held that manslaughter is a lesser-included offense of murder only if there is some evidence of sudden passion in the case arising from adequate cause. *Westbrook v. State*, 846 S.W.2d 155, 159 (Tex. App.-Fort Worth 1993, no pet.). Both "adequate cause" and "sudden passion" are defined as:

22

> (1) "Adequate cause" means cause that would commonly produce a degree of anger, rage, resentment, or terror in a person of ordinary temper, sufficient to render the mind incapable of cool reflection.
>
> (2) "Sudden passion" means passion directly caused by ... the individual killed or another acting with the person killed which passion arises at the time of the offense and is not solely the result of former provocation.

TEX. PENAL CODE ANN. §19.02(A)(1). Any evidence that the defendant acted under the immediate influence of passion, without time for cool reflection, arising from adequate provocation, supports sudden passion. *See Burns v. State*, 923 S.W.2d 233, 236 (Tex. App.-[14th Dist.] 1996). Something more than the presence of simple fear is required; there must be evidence that the defendant's state of mind rendered him incapable of cool reflection. *See Gonzales v. State*, 717 S.W.2d 355, 357-58 (Tex. Crim. App. 1986).

In order for a manslaughter charge to be proper, there must be evidence presented at trial of the condition of the defendant's mind at the time of the offense. *Merchant v. State*, 810 S.W.2d 305, 310 (Tex. App.-Dallas 1991, pet ref'd). *In Willis v. State*, the Court reasoned that no "sudden passion" was present because the "[a]ppellant's statement did not demonstrate such a sudden passion arising from adequate case." *Willis v. State*, 936 S.W.2d 302, 309 (Tex. App.-Tyler, 1996). Further, "[a]ppellant never state[d] that the incident caused him to be afraid or angry, or that he acted under any emotional distress." *Id.*

The record in this case contains direct evidence that Mr. Castaneda was under the immediate influence of sudden passion arising from an adequate cause. Mr. Castaneda testified at trial about the fear and anger he felt during his altercation with Mr. Armstrong:

Q: (Mr. Scott)    So once he put the gun in your face, what does it do to you psychologically, meaning what are you thinking?

A: (Mr. Castaneda)  I'm scared. I flip out. My whole demeanor changed .....

Q:    Did you think he was going to kill you or not?

A:    Yes, sir, I did.

Q:    So you're in fear of your life, right?

A:    Yes, sir.

Q:    ... And your actions, I gather then, were protective at that point in time, correct?

A:    Yes, sir.

(6 R.R. at 42-43, 45). The present case is distinguishable from that in *Willis*. Mr. Castaneda acted with sudden passion when he entered into the physical altercation with Mr. Armstrong. Further, Mr. Castaneda's actions arose from adequate cause; namely, Mr. Armstrong threatening everyone in the house with a gun. There was direct testimony in this case that Mr. Castaneda was experiencing intense emotions when he was locked in the house on Van Fleet, and he acted under sudden passion when the gun was pointed at him.

*The error was harmful and requires reversal.*

The defense attorney made a specific request to the trial court following the close of evidence and prior to closing arguments. (6 R.R. at 144-45). The trial court denied defense counsel's request for the lesser-included offense instruction. (6 R.R. at 145). Because a timely objection was made to the jury charge, a showing of "some harm" to a defendant will mandate reversal. *Barron v. State*, 353 S.W.3d 879, 883 (Tex.

24

Crim. App. 2011). Mr. Castaneda received 45 years for murder - a conviction of a lesser offense might well have resulted in a shorter sentence. Therefore Mr. Castaneda should be acquitted of the murder conviction.

**Issue Three: The jury charge must distinctly set forth the law applicable to the case. The trial court submitted a jury charge that was confusing and did not clearly instruct the jury that the state carried the burden of disproving self-defense. Was Mr. Castaneda egregiously harmed by the trial court's failure to properly instruct the jury on the law of self-defense?**

*Relevant Facts*

Mr. Castaneda was indicted for the murder of Baron Keith Armstrong. (2 C.R. at 13). Patricia Asberry was the only witness called by the State who was at the house when the murder occurred. (4 R.R. at 93). Asberry testified that the decedent, Armstrong, was very angry and pointed a gun at her head in an attempt to find his keys. (4 R.R. at 142, 145). She testified that after Armstrong pointed the gun at her head, Armstrong walked over to Mr. Castaneda and told him that he wanted his keys. (4 R.R. at 146). Asberry said that the gun was behind Armstrong's back (4 R.R. at 146); Mr. Castaneda said that Armstrong pointed the gun at his face and an inch from his chest. (6 R.R. at 41, 43-44). He said that Armstrong later shot the gun while he was on the ground after being beaten by Mr. Castaneda. (6 R.R. at 62). In response, Mr. Castaneda grabbed a pipe and hit Armstrong approximately five times. (6 R.R. at 62-63). Armstrong died as a result of the beating.

The jury charge included an instruction on self-defense (2 C.R. at 69-71).

*Standard of Review*

Article 36.14 of the Texas Code of Criminal Procedure states in part:

[I]n each felony case … tried in a court of record, the judge shall, before the argument begins, deliver to the jury…a written charge distinctly setting forth the law applicable to the case.

26

In analyzing a jury charge issue, an appellate court's first duty is to decide whether error exists. *Barrios v. State*, 283 S.W.3d 348, 350 (Tex. Crim. App. 2009). If error exists, the court then analyzes that error for harm. *Id.* If the appellant did not object to the charge, the appeal courts examine the record for egregious harm. *Id.* Errors that result in egregious harm are those that affect "the very basis of the case," "deprive the defendant of a valuable right," or "vitally affect a defensive theory." *Ngo v. State,* 175 S.W.3d 738, 750 (Tex. Crim. App. 2005).

*The Trial Court Committed Error by Submitting a Faulty Jury Instruction*

A "trial judge must 'distinctly set[ ] forth the law applicable to the case' in the jury charge." *Reeves v. State,* 420 S.W.3d 812, 818 (Tex. Crim. App. 2013) (citing TEX. CODE CRIM. PROC. ART. 36.14). "'It is not the function of the charge merely to avoid misleading or confusing the jury; it is the function of the charge to lead and to prevent confusion.'" *Id.* (quoting *Williams v. State*, 547 S.W.2d 18, 20 (Tex. Crim. App. 1977)).

The Court of Criminal Appeals has held that if a trial court signals that self-defense is the law applicable to the case, then "any flaw in the charge on self-defense amounts to an error in the charge." *Barrera v. State*, 982 S.W.2d 415, 416 (Tex. Crim. App. 1998). In *Barrera*, "the failure to apply the law of self-defense to the facts of the case and to instruct the jury to acquit if they held a reasonable doubt on self-defense was error." *Id.*

"While generally, 'in the absence of evidence to the contrary, we will assume that the jury followed its written instructions,' this presupposes that the instructions are understandable." *Reeves*, 420 S.W.3d 818 (quoting *Miles v. State*, 204 S.W.3d 822, 827-28 (Tex. Crim. App. 2006)).

In the *Reeves* case, Judge Cochran criticized a self-defense provocation jury instruction from Harris County. She noted that the "first application paragraph contains 156 words in one sentence. The second paragraph contains 125 words in one sentence. Neither is comprehensible." *Reeves* at 818.

The application paragraph of the jury instruction in this case stated:

> Therefore, if you find from the evidence beyond a reasonable doubt that the defendant, Johnathan Renard Castaneda, did cause the death of Baron Keith Armstrong with his hand or with an unknown object, as alleged, but you further find from the evidence, as viewed from the standpoint of the defendant at the time, from the words or conduct, or both of Baron Keith Armstrong it reasonably appeared to the defendant that his life or person was in danger and there was created in his mind a reasonable expectation or fear of death or serious bodily injury from the use of unlawful deadly force at the hands of Baron Keith Armstrong, and that acting under such apprehension … he struck Baron Keith Armstrong with his hand or an unknown object, then you should acquit the defendant on the grounds of self-defense; or if you have a reasonable doubt as to whether or not the defendant was acting in self-defense on said occasion and under the circumstances, then you should give the defendant the benefit of the doubt and say by your verdict, not guilty.
> If you find from the evidence beyond a reasonable doubt that at the time and place in question the defendant did not reasonably believe that he was in danger of death or serious bodily injury, or that the defendant … did not reasonably believe that the degree of force actually used by him was immediately necessary to protect himself against Baron Keith Armstrong's use or attempted use of unlawful deadly force, then you should find against the defendant on the issue of self-defense.

(2 C.R. at 70-72)

Admittedly the self-defense instruction in this case does not rise to the level of the "six-page forest of legal 'argle-bargle,'" in *Reeves. Id.* at 817. However, it does rival *Reeves* in one respect: the length of the application paragraph. The Court noted that the application paragraphs in *Reeves* included a 156- and 125-word run-on sentence. The application paragraph in this case is a single 219-word sentence.

28

Also like *Reeves*, the application paragraph in this case did not clearly state the law. Importantly, the charge is missing any mention of who carries the burden of proving that Mr. Castaneda did or did not act in self-defense. When self-defense is at issue, the "defendant has the initial burden of producing some evidence to justify submission of a self-defense instruction. The State must then persuade the jury beyond a reasonable doubt that the defendant did not act in self-defense." *Tidmore v. State*, 976 S.W.2d 724, 729 (Tex. App.—Tyler 1998, pet. ref'd).

The self-defense instruction in this case did begin the application paragraph with, "Therefore, if you find from the evidence beyond a reasonable doubt," but the jury could have understood the instruction to mean that Mr. Castaneda rather than the State bore the burden of proving self-defense beyond a reasonable doubt.

The *Texas Criminal Pattern Jury Charge* on "Defenses" provides a more clearly articulated burden of proof for self-defense. It states:

*Burden of Proof*

> The defendant is not required to prove self-defense. Rather, the state must prove, beyond a reasonable doubt, that self-defense does not apply to the defendant's conduct.

*Texas Criminal Patter Jury Charges—Defenses* (2013), §B14.4, at 206§§.

If such an instruction was given to the jury in this case, it would have been clear that the State — *not* Mr. Castaneda — bore the burden of proof, and what exactly was to be proven.

Two other provisions of the charge could have also caused confusion for the jury. The charge defined the various elements of murder and applied the facts to the case on the page prior to discussing the elements and application of self-defense (2

29

C.R. at 67-68). In the application paragraph on murder alone, the charge said, "If you find from the evidence beyond a reasonable doubt that … Castaneda … did cause the death of Baron Keith Armstrong … then you will find the defendant guilty of murder, as charged in the indictment" (2 C.R. at 68). In this initial application paragraph, provided before the self-defense charge, there was no mention that self-defense was an issue. A preferable charge would have indicated that the jury needs to apply the law of self-defense to the murder charge, as in: "If you find from the evidence beyond a reasonable doubt that … Castaneda … did cause the death of Baron Keith Armstrong … then you will find the defendant guilty of murder, as charged in the indictment, *if you do not find beyond a reasonable doubt that Mr. Castaneda acted in self-defense.*"

A final provision of the charge that may have caused confusion was the section on non-provocation and no duty to retreat. The provision says that a "person who has a right to be present at the location where the deadly force is used … and who is not engaged in criminal activity at the time the deadly force is used is not required to retreat before using deadly force." Mr. Castaneda testified to possessing crack cocaine at the time he engaged in self-defense, and as a result the jury could have understood the charge to mean that Mr. Castaneda had a duty to retreat because of that criminal activity which had nothing to do with the altercation. However, that section did end by noting, "You are not to consider whether the defendant failed to retreat." But the conflict between the provisions of the charge and the facts of the case could have left the jury confused.

In conclusion, the trial court committed error since the jury instruction was confusing in various respects and did not clearly state the law.

30

*Harm Analysis: The Errors in the Jury Charge Amounted to Egregious Harm*

Trial counsel did not object to the charge in this case. As a result, this Court must review the error under the "egregious harm" standard of *Almanza. Almanza v. State*, 686 S.W.2d 157 (Tex. Crim. App. 1985). Egregious harm consists of those errors that affect the very basis of the case, deprive the defendant of a valuable right, vitally affect a defensive theory, or make the case for punishment clearly and significantly more persuasive. *Lee v. State,* 29 S.W.3d 570, 578 (Tex. App. – Dallas 2000, no pet.); *Matthews v. State*, 999 S.W.2d 563, 565 (Tex. App. – Houston, [14th Dist.] 1999, pet. ref'd).

> To determine whether the record establishes that the appellant suffered egregious harm, a reviewing court must consider 1) the complete jury charge, 2) the arguments of counsel, 3) the entirety of the evidence, including the contested issues and weight of the probative evidence, and 4) any other relevant factors revealed by the record as a whole. Neither party bears a burden of production or persuasion with respect to an *Almanza* harm analysis, the question being simply what the record demonstrates.

*Hollander v. State*, 414 S.W.3d 746 (Tex. Crim. App. 2013) (citations omitted). However, the Fourteenth Court of Appeals has determined this exact instruction is sufficient - but not necessarily clear. *See Gilder v. State*, 14-13-01088-CR, 2014 WL 7204962, at *4 (Tex. App.—Houston [14th Dist.] Dec. 18, 2014, no. pet. h.)(explaining "[w]hile the instruction in this case is sufficient, the Texas Pattern Jury Charge contains a more clear charge on self-defense. *See Comm. on Pattern Jury Charges*, State Bar of Tex., Texas Criminal Pattern Jury Charges: Defenses § B14.4 (2013)").

*A. The Jury Charge Itself*

The charge in this case consisted of five parts: 1) the abstract that included the statutory definitions and elements of the offense; 2) the self-defense instruction; 3) the application paragraph; 4) an instruction on the use of prior offense evidence; and 5) general instructions. The charge was confusing and failed to properly state the law.

As previously mentioned, there were various provisions in the charge that could have confused the jury. The initial application paragraph on murder failed to mention that the jury should consider self-defense. There was also a confusing duty to retreat provision.

Nowhere in the application paragraph of the self-defense charge was it stated that the state had the burden of proving beyond a reasonable doubt that the defendant did not act in self-defense, but rather simply said, "if you have a reasonable doubt…." The general instructions stated: "The prosecution has the burden of proving the defendant guilty and it must do so by proving each and every element of the offense charged beyond a reasonable doubt and if it fails to do so, you must acquit the defendant." Self-defense is not an element of the offense. No reference to the prosecution's burden regarding self-defense is mentioned. Whether the state or defendant has the burden of proving if the defendant did or did not act in self-defense is critically important and could make all the difference in terms of whether or not the defendant is acquitted.

*B. Arguments of Counsel*

Neither the State nor defense counsel mentioned whose burden it was to prove or disprove self-defense during opening statements. (3 R.R. at 15-24). The State did

32

not mention that Mr. Castaneda was going to claim self-defense, but defense counsel did. Counsel noted that, "to defend himself my client and the man got into a fight when the man was trying to kill him with the gun." (3 R.R. at 22). Defense counsel went on to note that the other members of the house jumped on Mr. Castaneda and "he was having a fight with the landlord slash pimp slash dope dealer. And then ultimately the man was killed." (3 R.R. at 22-23). Defense counsel concluded opening remarks by stating, "There was a fight. And if it had not been for my client's ability to fight with Mr. Armstrong, he would be dead now and he would have been gunned down in that residence on Van Fleet Street. And it's that pure and simple." (3 R.R. at 24).

During closing arguments, the State did not mention that it carried the burden to disprove self-defense, though the State did argue as to why this case did not involve self-defense. Much of the State's arguments focused on self-defense requiring "reasonable" force and that it be "immediately necessary." (6 R.R. at 155-156). The State claimed that the force used by Mr. Castaneda was "not to a reasonable degree. It's excessive, overkill. It's murder." (6 R.R. at 158). He later said that the force must be "immediately necessary" and has "got to be a reasonable belief of an ordinary person in that position." (6 R.R. at 178).

Unfortunately that is not an accurate description of the law. The self-defense statutes say nothing about "an ordinary person in that position." The deadly force statute says that a person is justified in using deadly force against another "when and to the degree *the actor* reasonably believes the deadly force is immediately necessary: to

33

protect the actor against the other's use of attempted use of unlawful deadly force." TEX. PEN. CODE §9.32(a)(2) (emphasis added).

While the prosecutor misstated the law in its closing, the charge did accurately state that the situation should be "viewed from the *standpoint of the defendant* at the time" and the jury should consider if it "reasonably appeared to the defendant that his life or person was in danger and there was created *in his mind* a reasonable expectation or fear of death or serious bodily injury…." (2 C.R. at 71). The effect of the prosecutor's misstatement of the law was to effectively lower the standard of self-defense by substituting an "ordinary person" standard for the law, which requires the jury to consider the views of the actor – "ordinary" or not. This could make it harder for Mr. Castaneda to prevail on his self-defense claim.

Defense counsel did not specifically tell the jury that the State has the burden of disproving self-defense, but he did attempt to explain self-defense. Counsel stated that a person "can use deadly force against anyone if it's a reasonable response to a deadly force that is being levied against you or the perception of deadly force." (6 R.R. at 168). When defense counsel attempted to say that the jury should consider the views of Mr. Castaneda "and what is his perception of what's going on," the court sustained the State's objection alleging defense counsel's characterization was a misstatement of law because the jury should only consider "what an ordinary person in the defendant's position" would consider. (6 R.R. at 167). Once again, the self-defense statute says nothing about considering an "ordinary person." The objection should not have been sustained.

34

*C. The Entirety of the Evidence*

Asberry and Mr. Castaneda — the only two witnesses who were at the scene when the murder occurred and who testified — agreed that the complainant was angry, he had a gun, and he pointed it Asberry. They agree that Armstrong's actions resulted in Asberry crying in fear.

The two disagreed on the details of what happened next. Asberry said that Armstrong had the gun when he walked over to Mr. Castaneda but did not point it at him. Mr. Castaneda said that Armstrong pointed the gun at his head and chest. Asberry did not say any shots were fired and that Mr. Castaneda continued to hit Armstrong with a pipe after he was not moving on the floor. Mr. Castaneda said that Armstrong shot at him, provoking him to hit Armstrong some more while Armstrong was on the ground.

The forensic evidence documented Armstrong's significant physical damage to his face, neck, and skull. The medical examiner testified that the cause of death was blunt force trauma to the head and neck.

In conclusion, Mr. Castaneda was egregiously harmed by the confusing charge that failed to clearly tell the jury that the State carried the burden of proving that Mr. Castaneda did not act in self-defense.

**Issue Four: Every defendant has a right to trial on legally sufficient evidence, which supports a conviction beyond a reasonable doubt for each element of the charged offense. Mr. Castaneda was convicted of aggravated sexual assault absent evidence that a deadly weapon was used and exhibited during the assault, an essential element to the charged offense. Did the jury convict Mr. Castaneda on the basis of insufficient evidence?**

The Fourteenth Amendment guarantees the right to trial on legally sufficient evidence. *Jackson v. Virginia*, 443 U.S. 307, 316 (1979); *Brooks v. State*, 323 S.W.3d 893, 916 (Tex. Crim. App. 2010). Therefore, this court must ensure that the evidence presented actually supports the conclusion that Mr. Castaneda committed aggravated sexual assault. *See Winfrey v. State*, 323 S.W.3d 875, 882 (Tex. Crim. App. 2010). Viewing all of the evidence in the light most favorable to the verdict, evidence is insufficient to support a conviction if no rational trier of fact could have found that each element of the charged offense was proven beyond a reasonable doubt. *Brooks*, 323 S.W.3d at 917.

Sufficiency of the evidence is measured by the elements of the offense as defined by the hypothetically correct jury charge for the case. *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). A hypothetically correct charge has its basis in the indictment allegations. *Gollihar v. State*, 46 S.W.3d 243, 255 (Tex. Crim. App. 2001). It accurately sets out the law, is authorized by the indictment, and does not unnecessarily increase the State's burden of proof. *Malik*, 953 S.W.2d at 240.

*The hypothetically correct charge required the State to prove Mr. Castaneda used and exhibited a deadly weapon during the assault*

A hypothetically correct charge for this case results from the statutory elements of aggravated sexual assault outlined in the Texas Penal Code, as modified by the

36

indictment. *See Curry v. State*, 30 S.W.3d 394, 404 (Tex. Crim. App. 2000). A person commits aggravated sexual assault if he:

1. intentionally or knowingly causes the penetration of the anus or sexual organ of another person by any means,

2. without that person's consent; and

3. uses or exhibits a deadly weapon during the commission of the assault.

TEX. PENAL CODE ANN. § 22.021(A). The indictment requires the State to prove:

1. Mr. Castaneda unlawfully, intentionally and knowingly caused the penetration of the anus of Ms. Asberry by placing his sexual organ in the anus of Ms. Asberry,

2. without the consent of Ms. Asberry; and namely,

3. Mr. Castaneda compelled Ms. Asberry to submit and participate by the use of physical force and violence and in the course of the same criminal episode, Mr. Castaneda used and exhibited a deadly weapon, namely a metal bar (I C.R. at 12).

Therefore, the State must prove as an essential element of the charged offense that Mr. Castaneda used and exhibited a deadly weapon during the assault. There was insufficient evidence to convict Mr. Castaneda of aggravated sexual assault because the State failed to prove this element.

*There was no proof Mr. Castaneda used and exhibited a deadly weapon during the assault*

Even if the jury could link Mr. Castaneda to an assault, he did not 'use or exhibit' a deadly weapon during the course of the assault. When the jury is the fact finder, there must be an express finding of a deadly weapon. *LaFleur v. State*, 106

37

S.W.3d 91, 92 (Tex. Crim. App. 2003). To sustain a deadly weapon finding, the evidence must demonstrate that: (1) the object meets the statutory definition of a deadly weapon, (2) the deadly weapon was used or exhibited during the crime, and (3) other people were put in actual danger. *Drichas v. State*, 175 S.W.3d 795, 798 (Tex. Crim. App. 2005). These requirements do not increase the State's burden of proof, but keeps it exactly the same. In contrast, if the State did not have to sustain a deadly weapon finding, the burden of proof would decrease. *See Curry*, 30 S.W.3d at 405 (noting that deleting the phrase "by using and threatening to use deadly force namely, a firearm" from the hypothetical jury charge would improperly decrease the State's burden of proof).

While the metal bar could meet the statutory definition of a deadly weapon, it was not "used or exhibited" during the crime, and did not put Ms. Asberry in actual danger.[3] To "exhibit" a weapon, the defendant must consciously show or display the weapon during the commission of the crime. *Patterson v. State*, 769 S.W.2d 938, 941 (Tex. Crim. App. 1989). Mere possession does not amount to use or exhibition. *Plummer v. State*, 410 S.W.3d 855, 864 (Tex. Crim. App. 2013); *McCain v. State*, 22 S.W.3d 497, 503 (Tex. Crim. App. 2000).

The object's intended use under the specific circumstances helps determine whether it is a deadly weapon. The determining factor is whether the weapon was

---

[3] There was an express finding that the metal bar was a deadly weapon when it was included in the indictment. However, including the deadly weapon language in the indictment does not amount to "use of exhibition" of the weapon to help facilitate the charged offense. There is an extra step here that must be proved, and cannot be assumed. *See Crumpton v. State*, 301 S.W.3d 663, 669 (Tex. Crim. App. 2009) (Meyers, J. dissenting) (noting to simply connect the indictment, listing a deadly weapon, to the verdict, and skip over the intermediate material that the jury considered, yields an incomplete analysis).

used in facilitating the underlying crime. *McCain*, 22 S.W.3d at 503. There must be some connection between the conscious exhibition of the weapon, and the commission of the offense. *Plummer v. State*, 410 S.W.3d 855, 864 (Tex. Crim. App. 2013). The defendant must use the weapon to instill apprehension in the victim. *McCain*, 22 S.W.3d at 503. Therefore, the jury must look beyond the mere fact that a metal bar existed; the jury must consider all of the evidence surrounding the situation.

For example, the victim in *McCain v. State* saw a knife sticking out of the defendant's back pocket during a robbery. *Id.* The victim believed the object was a knife, and that defendant would cut her with it. *Id.* at 499. The court concluded that a juror could rationally conclude that the knife was exhibited during the criminal transaction to instill a sense of apprehension in the victim, reducing the likelihood of resistance during the encounter. *Id.* at 503.

Unlike the defendant in McCain, who kept the knife in his back pocket during the robbery, Mr. Castaneda put the metal bar down on a table during the charged assault. (4 R.R. at 170). Mr. Castaneda did not keep the metal bar in his hand, nor on his person when Ms. Asberry said he assaulted her my forcing her to engage in anal sex. (4 R.R. at 170). Mr. Castaneda never consciously displayed the metal bar during the assault. Mr. Castaneda never threatened Ms. Asberry with the metal bar during the charged sexual assault. Mr. Castaneda never hit Ms. Asberry with the metal bar, although the complainant stated the metal bar was within his reach during the assault. (4 R.R. at 176). Further, unlike the victim in McCain, who believed the defendant would cut her with the knife, there was no evidence presented that Ms. Asberry feared Mr. Castaneda would hit her with the metal bar.

39

At most, the evidence here shows: (1) Mr. Castaneda previously had consensual sex with Ms. Asberry; (2) Mr. Castaneda did have a metal bar on a table during the assault; (3) Ms. Asberry did not feel threatened by the metal bar itself. Therefore, even if the jury believed Ms. Asberry's testimony that an assault occurred, a rational juror could not find that Mr. Castaneda compelled Ms. Asberry to participate in the episode by using and exhibiting a metal pole that put Ms. Asberry in actual danger. The evidence, even when viewed in the light most favorable to the verdict, is legally insufficient to support a conviction of aggravated sexual assault beyond a reasonable doubt.

**Issue Five: The trial court must hold an evidentiary hearing on a motion for new trial if the motion and affidavits raise matters not determinable from the record, and the accused could be entitled to relief. The trial court failed to hold a hearing on the motion, which included affidavits from available mitigation witnesses who defense counsel did not call to testify. Did the court improperly deny Mr. Castaneda a hearing on his motion for new trial?**

Mr. Castaneda was entitled to a hearing on the Motion for New Trial because his motion was supported by numerous affidavits from mitigation witnesses who were not called to testify at the punishment phase of the trial. The Motion for New Trial claims that defense counsel was ineffective for failing to call these mitigation witnesses. Innumerable cases have determined that defense counsel's failure to call witnesses to provide mitigation testimony amounts to ineffective assistance of counsel.

"A defendant is entitled to an evidentiary hearing on his motion for new trial if the motion and accompanying affidavit(s) raise matters not determinable from the record, upon which the accused could be entitled to relief." *Lucero v. State*, 246 S.W.3d 86, 94 (Tex. Crim. App. 2008) (*citing Wallace v. State*, 106 S.W.3d 103, 108 (Tex. Crim. App. 2003)). Affidavits must specifically set out the factual basis of the claim, but they "need not establish a prima facie case." *Smith v. State*, 286 S.W.3d 333, 339 (Tex. Crim. App. 2009). Affidavits need only give rise to "reasonable grounds in support of the claim." *Id.* "The purpose of the hearing is to give the defendant an opportunity to fully develop the matters raised in the motion." *Wallace*, 106 S.W.3d at 108 (*citing Martinez v. State*, 74 S.W.3d 19, 22 (Tex. Crim. App. 2002). Appellate courts review a trial court's decision regarding granting a hearing on a motion for new trial under an

41

abuse of discretion standard. *Lucero*, 246 S.W.3d at 94  (*citing Martinez*, 74 S.W.3d at 22).

A defendant alleging ineffective assistance of counsel in a motion for new trial will be entitled to a hearing if he alleges "sufficient facts from which a trial court could reasonably conclude both that counsel failed to act as a reasonably competent attorney and that, but for counsel's failure, there is a reasonable likelihood that the outcome of his trial would have been different." *Smith*, 286 S.W.3d at 340.

In *Martinez*, the defendant was convicted of possessing five to fifty pounds of marijuana and sentenced by a jury to eight years in prison. *Martinez*, 74 S.W.3d at 20. Martinez filed a "Motion for New Trial and Hearing Thereon," alleging ineffective assistance of counsel because his trial counsel did not timely inform him that the state had made a plea bargain offer recommending four years incarceration. *Id*. The motion included an affidavit from Martinez alleging that he was informed of the plea offer "the day before he was set to go to trial, and that the offer was increased to eight years the next morning." *Id*.  The affidavit also stated that if he had known about jury verdicts in that county, and he had sufficient time to discussion the "pros and cons" of going to trial, he would have been able to more effectively consider the plea offer and would have accepted it. *Id*.

The Court of Appeals held that "the affidavit was deficient and his motion was insufficient to put the trial court on notice that reasonable grounds existed to believe that counsel's representation may have been ineffective."  *Id*. at 21. The court noted three reasons why the affidavit was insufficient: 1) it stated that the defendant agreed with "trial counsel's decision not to accept or reject the plea offer, and to wait to see

what would happen the next morning," the day of trial; 2) it "failed to state unconditionally" that he would have accepted the plea offer if he knew about it in a timely manner; and 3) the affidavit "failed to establish when the plea offer was made by the state relative to when it was communicated to appellant and when the offer was withdrawn." *Id.*

The Court of Criminal Appeals concluded that "the court of appeals erred in its analysis of the sufficiency of appellant's affidavit supporting his new trial motion," and reversed and remanded the case with instructions to abate the appeal and remand it to the trial court to conduct a hearing on the motion for new trial. *Id.* at 22. The court noted that "defense counsel's failure to inform the defendant of a plea offer can constitute ineffective assistance of counsel and warrant reinstatement of the plea offer." *Id. (citing Ex parte Lemke*, 13 S.W.3d 791 (Tex. Crim. App. 2000)). That was the claim on which the Motion for New Trial was based and which the affidavit supported. As such, the "particulars of precisely when the plea offer was conveyed to defense counsel and the amount of time it remained available for acceptance are among factual matters that should be fully developed at a hearing." *Id.*

The trial record and affidavits that accompanied the Motion for New Trial in this case make an equally strong or stronger case than *Martinez* for a claim of ineffective assistance of counsel. As such, the trial court should have granted an evidentiary hearing on the motion.

The Motion for New Trial was based on an ineffective assistance of counsel claim for failure to present punishment evidence (2 C.R. at 102). The record shows that trial counsel did not call any mitigation witnesses at the punishment phase of the

43

trial, but does not evidence any acknowledgment of available mitigation witnesses. (7 R.R. at 7). Defense counsel simply said, "Defense rests and closes, Judge." (7 R.R. at 7). Multiple witnesses were available to testify about mitigating circumstances regarding Mr. Castaneda, as evidenced by the affidavits that accompanied the motion for new trial. Affidavits were provided by Mr. Castaneda's mother (2 C.R. at 120); his grandmother (2 C.R. at 127); two cousins (2 C.R. at 118, 131); another relative (2 C.R. at 123); and a friend of 16 years. (2 C.R. at 134). All could have testified to Mr. Castaneda's long-term mental illness, brain injuries caused by a car accident, and positive character traits. None of this evidence was presented to the court during the punishment phase or during an evidentiary hearing on the Motion for New Trial.

Numerous courts have held that failure to investigate and present mitigation witnesses during the punishment phase amounts to ineffective assistance of counsel. The Fourteenth Court of Appeals held that defense counsel was ineffective for failing to present any mitigating evidence at the punishment phase where the defendant was convicted of a first-degree felony of possession with intent to deliver at least 400 grams of cocaine. *Milburn v. State*, 15 S.W.3d 267 (Tex. App.-Houston [14th Dist.] 2000, pet. ref'd). Two years prior to the *Milburn* decision, the same court held that trial counsel was ineffective for failing to investigate any mitigation evidence for the punishment phase where the defendant received a 99-year sentence for delivery of less than 28 grams of cocaine with a prior felony conviction. *Moore v. State*, 983 S.W.2d 15 (Tex. App.-Houston [14th Dist.] 1998, no pet.). The court cited voluminous federal case law in agreement. *Id.* at 23-24.

As previously noted, a defendant alleging ineffective assistance of counsel in a motion for new trial will be entitled to a hearing if he alleges "sufficient facts from which a trial court could reasonably conclude both that counsel failed to act as a reasonably competent attorney and that, but for counsel's failure, there is a reasonable likelihood that the outcome of his trial would have been different." *Smith*, 286 S.W.3d at 340 (emphasis in original).

The failure of defense counsel to investigate and present available mitigation witnesses means that counsel failed to act as a reasonably competent attorney. While Mr. Castaneda did receive a mandatory life sentence for one of his convictions in this case (7 R.R. at 7-8; 1 C.R. at 73), his murder conviction resulted in a 45-year prison sentence, which could have been reduced if his family and friends were presented at punishment to testify about his history of mental illness, brain injuries, and his good character traits.

Since the timely Motion for New Trial was supported by numerous affidavits from mitigation witnesses who were not called to testify at the punishment phase, the trial court should have granted an evidentiary hearing on the motion to determine if trial counsel was ineffective and a new punishment hearing should be granted.

**Issue Six: The DNA court cost assessed against appellant is an unconstitutional tax on Mr. Castaneda.**

*Preservation of Error*

Challenges to court costs can be raised for the first time on appeal and "[c]onvicted defendants have constructive notice of mandatory court costs set by statute and the opportunity to object to the assessment of court costs against them for the first time on appeal or in a proceeding under Article 103.008 of the Texas Code of Criminal Procedure." *Cardenas v. State*, 423 S.W.3d 396, 399 (Tex. Crim. App. 2014). In a companion case decided the same day, the Court further explained that because the cost bill is most likely unavailable at the time of the judgment, an "[a]ppellant need not have objected at trial to raise a claim challenging the bases of assessed costs on appeal." *Johnson v. State*, 423 S.W.3d 385, 391 (Tex. Crim. App. 2014).

*Applicable Law*

The bill of costs for the sexual assault conviction reflect a $250 DNA fee. (1 C.R. at 75). TEX. CODE CRIM. PROC. ART. 102.020(A)(1) provides that "[a] person shall pay as a cost of court $250 on conviction of an offense listed in Section 411.1471(a)(1), Government Code." Aggravated sexual assault is listed in Section 411.1471(a)(1)(D), Government Code. Thus the $250 cost was properly included in the bills of cost.

However in *Peraza v. State*, this Court held the DNA Record Fee was not a legitimate court cost, but was instead an unconstitutional tax. *Peraza v. State*, No. 01-12-00690-CR, 2014 WL 7476214 (Tex. App. - Houston [1st Dist.] Dec. 30, 2014, pet. filed), In reaching this conclusion, this Court relied on *Ex parte Carson*, 159

S.W.2d 126, 130 (1942), wherein the Court of Criminal Appeals found that a $1 law library fee was "neither necessary nor incidental to the trial of a criminal case" and as such was "not a legitimate" cost of court.

In *Peraza*, the Court first addressed the thirty-five percent of the funds which are to be deposited in state highway fund. The Court determined that these funds "may be used for any function of TxDOT" and are not specifically limited to "defray the costs associated with collecting, storing, and testing DNA samples" *Peraza* at 6 & 7 (emphasis in original). After examining the TxDOT's mission statement and the various statutes listing TxDOT's responsibilities, the Court held that because "the responsibilities of TxDOT are far more remote from a criminal trial than the county law libraries which were to be used by the judges and attorneys for trial preparation in Carson"…it could not be "reasonably concluded that the portion of the revenue collected through the 'DNA Record Fee' and dedicated to the state highway fund constitutes a proper court cost to be assessed against appellant or any other criminal defendant." *Id.* at 7.

The Court then turned to the remaining sixty-five percent which is deposited in the criminal justice planning account. TEX. CRIM. PROC. ART. 102.020(H). "The criminal justice planning account is administered by the Criminal Justice Division ("CJD") of the Governor's Office. *Peraza* at 8 *citing* TEX. GOV'T CODE ANN. §772.006(A)(2) (Vernon 2012). Once again looking at the administering organization's mission, the Court determined "[t]he CJD …uses this money to '[s]upport a wide range of projects designed to reduce crime and improve the criminal and juvenile justice systems.'" *Peraza* at 9. The Court then found "the criminal justice planning

47

account, which is funded by the 'DNA Record Fee,' [does not ]pass[ ] constitutional muster" stating:

> …the money from the criminal justice planning fund is not required to be directed to the courts or to services necessarily or incidentally related to criminal trials. And often times such revenue is given to programs that, as the court in *Carson* specifically noted, could not possibly relate to legitimate court costs. *See* 159 S.W.2d at 127 (costs for training and education not legitimate court costs that may be assessed against criminal defendants).

*Id.*, at 10.  This court cost should be struck from the cost bill.

<div align="center">PRAYER</div>

Mr. Castaneda prays this Court reverse and remand for a new trial, or alternatively remand for a hearing on the motion for new trial or grant a new punishment hearing.

<div style="margin-left:40%">

Respectfully submitted,

**ALEXANDER BUNIN**
Chief Public Defender
Harris County Texas

*/s/ Jani Maselli Wood*
_____

**JANI MASELLI WOOD**
Assistant Public Defender
Harris County Texas
State Bar Texas Number 00791195
1201 Franklin, 13th Floor
Houston Texas 77002
Jani.Maselli@pdo.hctx.net
(713) 368-0016
(713) 368-4322
TBA No. 00791195

</div>

**CERTIFICATE OF SERVICE**

Pursuant to Tex. R. App. Proc. 9.5, this certifies that on January 28, 2015, a copy of the foregoing was emailed to counsel for the state (through texfile.com) at the following address:

Alan Curry
Assistant District Attorney
1201 Franklin Street, 6th Floor
Houston, TX 77002
curry_alan@dao.hctx.net

*/s/ Jani Maselli Wood*

_____

JANI MASELLI WOOD

49

## CERTIFICATE OF COMPLIANCE

Pursuant to proposed Rule 9.4(i)(3), undersigned counsel certifies that this brief complies with the type-volume limitations of *Tex. R. App. Proc. 9.4(e)(i).*

1. Exclusive of the portions exempted by *Tex. R. App. Proc. 9.4 (i)(1)*, this brief contains 13, 567 words printed in a proportionally spaced typeface.

2. This brief is printed in a proportionally spaced, serif typeface using Garamond 14 point font in text and Garamond 14 point font in footnotes produced by Corel WordPerfect software.

3. Undersigned counsel understands that a material misrepresentation in completing this certificate, or circumvention of the type-volume limits in *Tex. R. App. Proc. 9.4(j)*, may result in the Court's striking this brief and imposing sanctions against the person who signed it.

*/s/ Jani J Maselli Wood*

_____
JANI J. MASELLI WOOD